The next case for oral argument this morning is Andrew Case v. Kijakazi, 22-2379. Good morning, Mr. Forbes. Good morning, Your Honor. My name is Randall Forbes. I represent the Disability Claimant. I apologize in advance because I'm going to be talking about numbers almost the whole time, and that won't be very exciting. The Chavez case is kind of the culmination of a line of case law that talks about when Step 5 job numbers are reliable. There's a quote in there that I wanted to bring to your attention. It said, Vocational counselors have recognized that this crude data matching is highly inaccurate, and thus advised not to perform this analysis in other areas of their practice. Crude data matching meaning from the standard occupational classification code, which I'll try to say SOC code from here on out, and the dictionary of occupational titles, which generally I will call occupations or DOT, and in other areas of their practice, meaning when they're not testifying in front of disability hearings. So we have a judicial admission of this court, this court is almost at the highest level, saying it's highly inaccurate. And it's submitted that all top-down methodologies are unreliable. That hasn't been held yet, but then it hasn't really been completely argued, so I'm putting it before you today. So Mr. Forbes, the vocational expert here testified that he brought consistency between these two codes that we're talking about by using Skill-Tran. Right. And the ALJ appropriately followed up with some questions about that methodology and the use of Skill-Tran. Is your argument before us today that the use of Skill-Tran to make these two different systems talk to each other, that it's always unreliable, or that there's a problem here because the vocational expert didn't explain his methodology or appropriately use it? My argument today is both. It always is unreliable because top-down methodologies are not based on statistical principles. You cannot calculate a margin of error for them. Have we ever said anything that would support that in our case law? That top-down? In Chavez, it said it had to have a reasoned and principled analysis. And I'm submitting that you can't have a principled analysis with top-down methodologies. You can't calculate a margin of error. The numbers in the national economy are too big to ballpark, too big to come up with reliable judgments. How does that argument square with our standard of review here of substantial evidence, which is very deferential? It is very deferential, but you've got to have reliable testimony to have substantial evidence. I'm saying that it's inherently unreliable. Now, assuming that there is some seed of reliability in all of this, then I will go through what you were alluding to. That is that in Donahue, one of the first cases to really delve into this, said evidence is not substantial if vital testimony is conjured. The vital testimony in a top-down methodology, including Skiltran, and Skiltran is a species of equal distribution. And the Milner case that I cited from the district court in New Mexico does a really great job of setting forth all of those issues, and I recommend it. The vital testimony is once you've figured it all out as to what the broader grouping is, and that's where the difference between Skiltran and your standard equal distribution top-down methodology is, is that the standard equal distribution starts and ends with the SOC code total job number, whereas Skiltran kind of creates this broader grouping that looks at industries to come up with your total job number before it's allocated down by equal distribution. So there's no discussion. So, Mr. Forbes, if Skiltran presents itself and says they are using the occupational density method, the VE testified, I used the Skiltran approach. What more did the vocational expert need to describe to demonstrate to the ALJ that the Skiltran method was reliable? First of all, occupational density is a portion of Skiltran. It's used as a nomenclature only to distinguish it from straight equal distribution. But there is an equal distribution component in Skiltran, and whether Skiltran is a bigger bucket of water than your standard SOC code doesn't matter. The arsenic of equal distribution is in both of them, and both of them are unreliable. But I will now go to the specific reasons that the vocational expert gave. One flaw in his testimony is he does not talk about the specific allocation down to the DOT, which is the vital testimony. That's what it's all about. He doesn't talk about it. Then he talks about, well, it's an underestimate. Well, if the original estimate is based on faulty methodology, then it matters not whether it's an underestimate or an overestimate, and you can't really tell. Is it required to give the mathematical formula? You have to describe it, and the verbal description sometimes is as good as the symbolic mathematical formula. And there's a case law that says they don't. But, I mean, equal distribution is math. Divide the SOC code equally by the number of DOT titles. Skiltran is math. Divide the industry grouping by titles that have been infused in it with numbers that were based on equal distribution. So I'll say one more thing, and then I'll sit down and have one minute left. He also testifies how he sees Skiltran is consistent over time. Well, what gives Skiltran or straight equal distribution consistency over time is the fact that they are tied to the SOC code. Now, SOC code job numbers are- I'm sorry. Can you tell me the abbreviation? Standard Occupational Classification Code. Got it. My apologies. No, it's fine. SOC code job number totals are consistent because they're based on statistical principles and Bureau of Labor Statistics and Bureau of Census and Office Management Budget surveys. It's real statistics. That's- so if- You're into your last minute. Yeah, I know. If you apply the same faulty method year after year to this statistical base, it's going to look consistent. But in reality, it's just consistently bad. So that explanation that he gave, the VE gave, doesn't do anything to give him reliability. Thank you. Thank you, Mr. Forbes. Ms. Payne, good morning. Good morning, Your Honors. May it please the court. Counsel Lindsay Payne on behalf of the Acting Commissioner of Social Security. Mr. Case's counsel has directed, Your Honors, to the court's decision in Chavez, and Chavez is indeed instructive on this point. It's noteworthy that the problem in Chavez was that the vocational expert said, Well, I looked at two potential methods. One of them was the straight equal distribution method, which led me to believe there were 108,000 of these jobs available in the national economy. The other one was Skiltran, and Skiltran told me that there were 800 of these jobs available in the national economy. So I went with the 108,000, and I can't tell you why I did that, but it sounded better to me. And, of course, this court found that that was not an adequate explanation of the vocational expert's methods for how he reached his estimate. This court also gave some telling analogies looking at, for example, it doesn't take an expert to know that certain chef-type jobs, such as pizza baker, are going to be more common in the national economy. Ms. Payne, can you tell me, just looking at the V.E.'s testimony in this case, when he was asked the question, Why do you find Skiltran reliable? What's his answer to that question? You know, he was speaking from his viewpoint as a vocational expert. He said that, one, I have a Ph.D. in counseling and personnel services. I've been placing individuals in jobs for more than 40 years. I've used Skiltran for many years. From my viewpoint as a vocational expert, it's reliable because from year to year, the results remain relatively consistent in line with what I expect as a vocational expert. So he was speaking to the fact that he's not… Now, I agree, Ms. Payne, if that was in the record, what you just summarized, and I can't find that explanation. The explanation that I just gave? Mm-hmm. That is at AR 77. There's a back and forth between… Right. …the ALJ and the vocational expert. And the ALJ appropriately… And he never relies on his experience or Ph.D. to answer the question involving Skiltran's methodology, does he? I think it would be, you know, maybe overly critical of the transcript here and the context in which the testimony took place to say that Dr. Barkhouse didn't rely on his Ph.D. and his 40 years of experience. He was speaking to, you know, whether he was getting results in line with what he expected, the fact that he had personally observed these jobs being performed in the economy, and… That's not the answer that he gave, though. That's if we were able to pool the language together. When he was asked the question directly, he gave a description of the occupational density method. Right. When he was asked how does Skiltran work, essentially, he described qualitatively the way that Skiltran works. And so he was able to provide vital information that was missing in the cases that this court has remanded. Firstly, he identified the source of his job estimates as Skiltran, and he confirmed that the data source for Skiltran was the Standard Occupational Classification System, or SOC codes, that Mr. Forbes was referencing, which are published in the Department of Labor's Occupational Employment Statistics. And it's when he went to the second hypothetical, when he described, I did not use the Skiltran methodology at all, when looking at hypothetical number two, that was based on my experience in the field and my years of being a vocational expert. That's when he answered that question based on his experience. To a certain extent, but that response serves to demonstrate that as an expert in the field with these 40 years of experience, Dr. Barkhouse was qualified and able to understand when he could rely on the Skiltran numbers and when he couldn't rely on the Skiltran numbers. If Skiltran doesn't take into account whether an individual has limitations in one arm versus both arms, as came into play in the second hypothetical, Dr. Barkhouse had the expertise to know, I have to rely on my expertise and training here and know that there is going to be no competitive employment for an individual who has no use of his left arm. Is it the position of the commissioner, then, whenever a vocational expert says, I use Skiltran, is that sufficient for reliability for the ALJ to rely on those estimates? Unlike Mr. Case here, the commissioner is not asserting that there is any hard, fast, across-the-board rule. But we are asserting that Dr. Barkhouse's testimony here cleared the low bar for substantial evidence. The court has explained that when a vocational expert's numbers are challenged, the ALJ should make sure that the vocational expert provides an explanation. The ALJ here did that, going back to Dr. Barkhouse and asking for an explanation, but this court has also made clear that the standard for evaluating that explanation is not overly exacting. What software did the vocational expert use in this case? Skiltran has various forms of software. Which one did the vocational expert testify that he used? So, based on context, it appears that it would have been clear to everyone there that Dr. Barkhouse was using Job Browser Pro. He didn't testify to that, though, did he? He used Skiltran as a sort of shorthand for referring to Job Browser Pro. It's noteworthy that immediately when the vocational expert testified that he used Skiltran, it's not as if Case's attorney seemed to not understand how that worked. Mr. Forbes was the attorney there. Obviously, he has a good understanding of how this resource works, as does the ALJ. Immediately when Dr. Barkhouse said he used Skiltran, Mr. Forbes came back and said, Okay, so the data source for Skiltran is the standard occupational classification system, right? The SOC codes. And he immediately knew also that Skiltran uses a mathematical formula or an allocation factor that is based upon the Department of Labor's industry data. Essentially cross-referencing the SOC codes with data about this is where the bulk of the jobs exist in the national economy. We're going to look at the industries that are holding most of the jobs. So, although if we take individual statements out of the context of the hearing, they might be a little difficult to follow. It appears that everybody at the hearing was on the same page, and really the only question that Dr. Barkhouse couldn't answer was, What was the precise mathematical formula or algorithm that Skiltran used to apportion the total number of jobs from the SOC codes into the individual DOT categories? And this court has rejected already the argument that that is necessary for an ALJ to reasonably rely on a vocational expert's testimony. In Bruno v. Saul, the court said that a precise mathematical formula or the allocation factor is not necessary, and instead it is okay for the vocational expert to qualitatively describe the process as Dr. Barkhouse did here. But did you describe it, Ms. Payne? The authority is given to the vocational expert, not to the computer software, to identify reliable methodology. And so, again, I'm just looking for where that explanation was given for why the vocational expert found the Skiltran jobs browser software reliable. Well, as someone with 40 years of experience and a PhD, he was relying on a resource that is generally relied on, has been broadly recognized throughout the federal courts as being relied on by vocational experts in the field. As I mentioned previously, he was obviously using his professional judgment. He understood when a job was going to be completely eliminated, whether or not Skiltran was able to capture that. And as this court stated in Fetting v. Kijikazi, it's not necessary to provide a formula leading to the job numbers. It's okay if a vocational expert describes his general process. This court has already rejected. In Fetting, though, the methodology was not contested, correct? Well, the vocational expert in Fetting was asked to provide a mathematical formula. It was not objected to, though, right? Oh, there's correct. This court did make a forfeiture ruling in Fetting. That's what I thought. Okay. Absolutely. But we would ask for all of these reasons, and those stated in the commissioner's brief, that the court affirm. Thank you. Thank you, Ms. Payne. Mr. Forbes, you have just a little bit of time left. Well, I am one of the most experienced attorneys on this issue in the country, and Mr. Barkas has 40 years of experience, and I've cross-examined him for 20 of those years. So the question I have is if I ask him directly what is the allocated formula, why did he say he did not know? That should be taken into account when we're talking about credibility. The Chavez attorney, or excuse me, that was me, the Chavez V.E. had 30 years of experience. His testimony was equivocal because he was asked essentially at the hearing to tell us which one of these unreliable methodologies is the most reliable. That's an oxymoron. He couldn't. Okay. Thank you, Mr. Forbes. So he picked it out of thin air. Thank you. The case will be taken under advisement.